[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has filed petitions for termination of parental rights with respect to each of the above-named children. Each petition was filed on February 26, 1996 at the Superior Court for Juvenile Matters in Hartford. The case was subsequently transferred to this venue for trial.
The petitions seek to terminate the parental rights of the children's mother, Evelyn R. The father, Anibal T. Sr., died on July 22, 1995 (The parents were never married, but lived in a common-law relationship for a number of years and regarded each other as husband and wife.)
Pursuant to the applicable provisions of CGS § 17a-112, DCF has alleged the statutory grounds of abandonment and failure to rehabilitate by the mother in each TPR petition. The petitioner has also alleged, with respect to each child, that both grounds for termination existed for at least one year prior to the date the petitions were filed on February 26, 1996.
PROCEDURAL HISTORY
DCF filed neglect and uncared for petitions with respect to the four children on March 15, 1994 at Superior Court for Juvenile Matters in Hartford. Those petitions alleged that the children were being denied proper care and attention, were being permitted to live under conditions, circumstances or associations injurious to their well-being, and that they were homeless. The petitions were filed after DCF received a complaint from Hartford school officials in December 1993 that the three oldest children had not been attending school since the academic year began the prior September. DCF alleged that the chronic and long-standing heroin addiction of both parents prevented them from properly caring for all four children.
On May 26 1994, Cindy, Anibal Jr., Joel and Stacy were committed to DCF for a period of 18 months, following nolo contendere pleas in court by both of their parents. On that date, both parents signed a written, court-approved expectation form, which is referred to at greater length elsewhere in this decision. On October 5, 1995, the Court granted DCF's petition to extend the commitment of each child. The court also found on that date that continued efforts to reunify the children with their family were "no longer appropriate." (The commitment was extended by the court for a second time, by agreement of the parties, on CT Page 7604 October 17, 1996 while this trial was in progress.)
Trial on the termination petitions began on August 29, 1996 and was continued for hearing on September 6, 1996, and on October 17, 1996, when the matter concluded. DCF, the respondent mother, and the minor children were represented by their respective counsel throughout the proceeding. The mother was present in court on each day of the trial.
DCF introduced the testimony of the following witnesses at trial:
 1. Shirley Crossway, DCF Social Worker; 2. Sonia S., the children's paternal aunt and foster parent; 3. Philip Richmond, Associate Director, Hartford Dispensary; 4. Emily Cross, Adult Probation Officer; 5. Arthur Lilley, DCF Social Worker.
The respondent mother called two witnesses to testify on her behalf during the proceeding:
 1. Daisy Baez, Case Manager, Hispanic Health Council; 2. Lynn Bryant, Counselor, Hartford Hospital.
No evidence or testimony was introduced by counsel for the minor child.
FINDINGS OF FACT
The court, having carefully considered the testimony of the witnesses and the evidence adduced at trial, makes the following findings of fact:
The Hartford Public School System referred the children to DCF after the three older siblings missed the first half of the 1993-1994 academic year. The failure to enroll the children in school was symptomatic of each parent's long-standing drug addiction. The chronic substance abuse problems experienced by both the mother and father ultimately rendered each of them unable to properly care for the four children. One indicia of the extent of this parental neglect was the fact that Cindy, who was 12 in 1994, had taken on the role of parent for her three younger siblings. DCF social worker Arthur Lilley, who assumed the case in November 1994, testified that Cindy was a "parentified child." He testified that Cindy had become a surrogate parent for her siblings, looking out for their needs, and speaking for all of them. CT Page 7605
In March 1994, the mother recognized that she was no longer able to adequately care for the children and voluntarily placed them with relatives. The girls, Cindy (DOB July 30, 1982) and Stacy (DOB June 19, 1990) were sent to live with their paternal aunt, Sonia S., and her husband, Victor. The boys, Anibal Jr. (DOB February 28, 1985) and Joel (DOB July 20, 1987) were at first placed with Alberto T., a paternal uncle. In February 1995, Anibal Jr. and Joel were reunited with their sisters when they came to live with Sonia S. All four children have resided continuously with the aunt since that time. DCF has licensed Sonia as a foster parent, and views her as a long-term relative placement resource for the children.
When the children were committed to DCF on May 26, 1994, both parents signed court-approved expectation forms, which set out in writing what conditions each would have to meet in order to achieve reunification. (Petitioner's Exhibit 1.) Both mother and father agreed to keep all appointments set by or with DCF, to keep DCF and their lawyers advised of their whereabouts, and to "cooperate with applicable Dept. of Corrections" (sic). This last expectation — although cryptic — apparently referred to substance abuse therapy programs which would be offered to the parents through the criminal justice system. DCF social worker Shirley Crossway testified at trial that both parents understood that the last expectation required each of them to get any drug treatment required of them by either the Department of Corrections or the Department of Adult Probation. At the time of commitment, father was incarcerated, and mother was also involved with the criminal justice system as a result of an arrest on July 5, 1993. On September 20, 1994, Evelyn R. was convicted on felony counts of burglary, third degree, and failure to appear, first degree. She was sentenced to a term of four years' incarceration, execution suspended, and four years' probation on each count, with the two sentences running concurrently. (Testimony of Probation Officer Emily Cross). As special conditions of that probation, the mother was ordered to enter and successfully complete an in-patient substance abuse program at Blue Hills Clinic and receive other appropriate drug treatment. Per Ms. Cross, Evelyn R. entered Blue Hills and was discharged successfully from there on November 7, 1994. After her release from Blue Hills, the mother was given the option of entering a residential drug treatment facility known as Clayton House. The program, which runs 4-6 months, offered Evelyn R. considerable structure and treatment, in addition to a place to live. The mother declined placement at Clayton house, opting CT Page 7606 instead for residence in a YWCA Shelter Program, which was less-structured than Clayton House.
It is unclear to the court what substance abuse treatment, if any, mother received during the six-month period after her discharge from Blue Hills in November 1994. In May, 1995, mother was admitted to an out-patient methadone maintenance program operated by the Hartford Dispensary. (Testimony of Philip Richmond). Methadone is a synthetic opiate which is used to treat persons who are actively abusing heroin. It is administered to addicts under clinical supervision, and according to medically-prescribed dosages. The legally-prescribed methadone is a "drug substitute" for heroin, and other opiate-based street drugs. It blocks an addict's craving for heroin and eliminates heroin withdrawal symptoms. The ultimate goal of this treatment modality is to reduce patients' dependence on methadone, and then ultimately remove them completely from that drug. In addition to providing them with methadone, the Hartford Dispensary program offers patients family counseling and recovery education programs, and recommends that its patients attend 12-step peer recovery programs such as Narcotics Anonymous and Cocaine Anonymous. (Testimony of Philip Richmond.)
Evelyn R. entered the dispensary's methadone maintenance program in May 1995, and was still enrolled in it when this trial commenced. According to Philip Richmond, who is the Associate Director for Clinical Operations at Hartford Dispensary, this was the mother's second admission to the methadone program. (She had previously been enrolled there from November 1989 until July 1992.) Mr. Richmond testified that in order to be admitted to his agency's methadone program, patients must be 21 years of age, and be able to document that they are addicted to opiate drugs. Program regulations forbid patients from using heroin or any other narcotics while taking the methadone, and illicit drug use is grounds for discharge from the program. Regular drug screens are taken by the dispensary in order to monitor compliance with this requirement.
Mr. Richmond, who is a clinical psychologist and certified drug abuse counselor, testified that addiction is a "chronic relapsing disorder." He testified that heroin is psychologically and physiologically addictive, while cocaine is psychologically addictive, but not physiologically addictive.
The Hartford Dispensary records indicate that from the date CT Page 7607 Evelyn R. was admitted to the methadone program in May 1995, until the date the TPR petitions were filed on February 26, 1996, she continued to abuse both heroin and cocaine. Despite receiving regular doses of methadone, the mother tested positive for heroin on the following dates in 1995: May 17, June 14, June 15, June 21, July 17, August 3, September 21 and October 6. Her urine screens were positive for cocaine on the following dates in 1995 and 1996: May 1, May 17, June 5, June 14, June 21, July 17, August 3, September 6, September 12, September 21, October 6, November 2, November 17, December 7, December 13, December 22, December 29, January 3, January 11, and January 16.
As a result of her violation in continuing to use heroin and cocaine, the Dispensary issued a warning to the respondent in September 1995. According to Mr. Richmond, Evelyn R. did not attend the recovery education groups which were made available to her through the dispensary. These group sessions are designed to give substance abusers the skills and support they need to remain drug-free. Mr. Richmond "did not know" if mother attended the NA and CA meetings offered by the program. The dispensary requires its patients to sign NA attendance sheets, and Mr. Richmond stated that there "was no evidence" that the respondent participated in these 12-step program sessions. Mother did receive some family counseling from a therapist at the dispensary.
As Evelyn R. continued to abuse drugs, she slipped further and further away from the lives of her four children. The mother could have visited her children at the home of Sonia S. at almost any time. In addition, DCF social worker Arthur Lilley agreed to bring the children to the YWCA for special visits with the mother when he assumed the case in November 1994. The mother missed the first visit which was scheduled at the YWCA due to a conflict with her counseling. She thereafter left the YWCA, and no further visits were scheduled there. Mr. Lilley testified that from December 1994 until February 1996, the respondent never visited with the children of her "own initiative." Testimony by DCF social workers and Sonia S., the paternal aunt, indicate that the mother's visitation was very infrequent during 1995 and during 1996 prior to the filing of the TPR petitions. Sonia S. testified that the mother saw her children approximately five times during 1995 — three times at the aunt's home and twice at the hospital where the father was hospitalized with a terminal illness.. She stated that Evelyn R. sent the children presents at Christmas 1995 but did not send them birthday presents that year, and did CT Page 7608 not visit or call to speak with the children that year on Christmas, or their birthdays. Sonia S. believed that the mother visited so infrequently because she did not want the children "to see her the way she was."
DCF was unable to contact the respondent after she left the YWCA shelter. From that date, until the TPR petitions were filed, DCF social worker Lilley made a number of visits to the mother's legal address at 183-185 Wethersfield Ave. in Hartford, without ever making contact with the respondent. On at least one occasion, Evelyn R.'s mother told the worker that her daughter did not live at that address. Notes and cards which the worker left there for the respondent were never answered.
The respondent testified at trial and offered explanations about her drug problems and her care of the four children. She testified that she did not abuse drugs in the 1980s, but began using heroin six years ago. By 1993, the mother was using a bag of heroin — which cost $20 — almost every day. Evelyn R. also testified that she began abusing cocaine approximately five years ago. Her usage of that drug increased to a frequency of approximately twice weekly. She used some of her social assistance payments to purchase narcotics, although she frequently depended on her friends to supply her with the illegal substances.
The mother claimed that she did not enroll her children in school in 1993 because she "had a drug problem", and also because she did not have school clothes and supplies for the children. She stated that she was a "good parent" before she began abusing drugs, and voluntarily relinquished custody of the children in 1994 because she was not meeting the children's expectations. She acknowledged signing the court-approved expectations when the children were committed to DCF, and admitted that she knew that she had to obtain drug treatment in order to facilitate reunification. The mother also testified that she became depressed when Anibal T. Sr., the children's father, passed away in July 1995. She stated that this loss caused her to regress, and contributed to the lack of frequency with which she visited the four children. Although she claims to have visited them more often than DCF alleges, she admitted that she was not "thinking straight" following the death of Anibal T. Sr.
All of the evidence adduced at trial leads the court to find that, during the period of time in question, Evelyn R. suffered CT Page 7609 from a chronic and extremely serious addiction to heroin and cocaine. Unfortunately, the vice-like grip of this drug problem totally controlled the respondent's life, and has rendered her completely unable to care for her children appropriately since 1993.
 ADJUDICATION
(on facts as of February 26, 1996)
1. Abandonment — § CGS 17a-112(b) provides that a child is abandoned if his or her parent has "failed to maintain a reasonable degree of interest, concern or responsibility" for the child's welfare. (See also, In re Juvenile Appeal, 183 Conn. 11,438 A.2d 801 (1981).) The question of whether or not abandonment has occurred in a particular case focuses on the conduct of the parent. In re Rayna M., 13 Conn. App. 23, 534 A.2d 897 (1987).
During the period of time which elapsed between commitment and the filing of the TPR petitions, the mother visited the children only sporadically. Furthermore, it was established that most of those infrequent visits were initiated by the children, and not by the respondent. Had she chosen to do so, the mother could have visited with her children at almost any time she wished. Evelyn R. also failed during this period to take an active interest in the day-to-day needs of the children. Her absence from their lives at Christmas, on their birthdays, and as they grieved for their father, is a further indication of statutory abandonment. It is well established under our case law that the word "maintain" as used in CGS § 17a-112 (b) implies a "continuing, reasonable degree of concern". In re Migdalia M.,6 Conn. App. 194 (1986); In re Rayna M., op. cit. Since March of 1994, the mother's addiction has prevented her from participating in any consistent way in the children's lives, and she has not demonstrated a reasonable degree of interest, concern or responsibility as to their welfare. Accordingly, this court finds that the petitioner has proven by clear and convincing evidence that Evelyn R. abandoned her children, and that this statutory ground for termination had existed for not less than one year prior to the commencement of this action.
2. Failure to Rehabilitate: CGS § 17-112 (b) also defines this non-consensual ground for termination of parental rights. The statute applies in those cases where:
"the parents of a child who has been found by the superior CT Page 7610 court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the child, they could assume a responsible position in the life of the child."
Evelyn R.'s severe substance abuse problems, which historically date back to at least 1989, reached flash-point stage during 1993. In July of that year, the respondent was arrested on a felony burglary charge. In December of 1993, Hartford school authorities referred the mother to DCF because she had failed to enroll the three oldest children in school for half of the academic year. The respondent has admitted that this educational neglect resulted from her drug addiction. When the children were committed to DCF on May 26, 1994, the mother signed expectations. Although the document which respondent signed in Court could have been written more expansively and articulately, the respondent clearly understood then that she needed drug treatment, and that successful completion of such therapy was expected of her as a prerequisite to reunification with Cindy, Anibal Jr., Joel and Stacy.
Approximately 22 months elapsed from the date of commitment until the initiation of this TPR action. During that time, the mother had the benefit of out-patient methadone maintenance treatment at the Hartford Dispensary (commencing in May 1995) and in-patient treatment at the Blue Hills clinic (in 1994, and again during January and February of 1996). In addition to the methadone, the Dispensary's program offered the mother a full array of supportive services, including family counseling, Narcotics Anonymous meetings, and recovery education groups. Although she received some family counseling at the dispensary, the respondent did not attend the recovery education programs, and there is no evidence that she attended NA meetings as required by the program. The court also notes that when Evelyn R. was released from Blue Hills clinic in November 1994, she was offered the chance to participate in a structured, four to six month residential drug treatment program at the Clayton House. She elected to reject this opportunity.
Despite these offers of assistance, and the actual treatment which she did receive in the methadone program, the respondent was totally unable to come to grips with her addiction during this period. She persistently continued to abuse heroin and CT Page 7611 cocaine, despite the fact that she received regular doses of the substitute methadone. The domination which illegal drugs had over mother is demonstrated by the fact that she continued to abuse narcous despite the risks of removal from the methadone program, possible incarceration for probation violation, and the potential loss of her children. Evelyn R. also avoided the DCF workers assigned to her case, failed to keep them appropriately appraised of her whereabouts, and, until recently, rebuffed all but minimal contact with her four children since their placement in foster care.
The term "personal rehabilitation" as used in the termination statute has been defined to mean "the restoration of a parent to his or her former constructive and useful role as a parent." Inre Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 1993 Conn. 802, 474 A.2d 1259 (1984).
Evelyn R.'s failed treatments, ongoing and chronic substance abuse, and inability to parent from the date of adjudication until the termination filing, compel the court to conclude that the respondent has failed to rehabilitate, and that she will not be able to resume the role of parent to her children within a reasonable time. In making this finding, the court has also considered the ages and needs of the children, particularly in light of the amount of time each has already spent in foster care.
Accordingly, the court finds that the petitioner has met its burden of proving failure to rehabilitate by clear and convincing evidence, and further finds that this ground for termination had existed for not less than one year prior to the filing of the termination petitions. The court also finds that DCF made reasonable efforts during the period in question to reunify the children with their mother.
DISPOSITION
Contested termination of parental rights trials consist of two distinct phases: the adjudicatory phase, and the dispositional phase. Connecticut Practice Book § 1042.1, 1043.1 and 1049.1. Although the court may hear evidence as to both adjudication and disposition during the course of the same trial, it must first determine that one of the statutory grounds for termination has been proven before it considers the issue of disposition. Connecticut Practice Book § 1042.1(4); In reCT Page 7612Valerie D., 223 Conn. 492, 511, 613 A.2d 748 (1992).
Having determined in this case that the petitioner has met its burden of proof with respect to both of the grounds for termination which were alleged in the petitions, the court now considers the issue of disposition.
Following the filing of the TPR petitions in February of 1996, the respondent continued to abuse illicit drugs for several more months.. Hartford Dispensary records indicate that the mother's weekly drugs screens were positive for cocaine on April 1, 1996, April 16, 1996, April 26, 1996, May 17, 1996, May 21, 1996, June 12, 1996, July 10, 1996, July 18, 1996 and July 29, 1996. Her tests were positive for heroin on May 17, 1996, May 21, 1996, June 12, 1996 and July 10, 1996. The mother also continued to avoid contact with DCF workers. Mr. Lilley indicated in his social study (Petitioner's Exhibit 2) that "Mother is supposed to be staying with her mother at 185 Wethersfield Ave apartment B-12, where she was served with petitions for termination of parental rights. This worker has been unable to contact mother at this address."
The respondent has, however, remained drug-free during the past 6-8 weeks. She testified on October 17 that she rendered drug-free specimens during four successive weekly tests administered by the dispensary and is now tested there only once per month. She is continuing with the methadone program, has been admitted to an additional substance abuse program at the Institute of Living and attends weekly NA meetings on Saturday at the Blue Hills clinic. The respondent testified that she is now taking her "efforts at recovery seriously." The mother has also been receiving supportive and appropriate services from the Hispanic Health Council in Hartford, and from Lynn Bryant, a counselor at Hartford Hospital. Both Daisy Baez, a case manager at the Hispanic Health Council, and Ms. Bryant testified on mother's behalf at this trial.
The mother's efforts at visitation have also improved considerably since the commencement of this trial in late August, 1996. Since then, she has visited them weekly at the home of Sonia S. since then, and calls them on the telephone every other day.
The improvement which mother has demonstrated since the outset of trial is certainly commendable, and the court earnestly CT Page 7613 hopes that it will continue. But the central focus of this proceeding must be the best interests of Cindy, Anibal Jr., Joel and Stacy.
Both DCF and the children's attorney have recommended that termination is in the best interests of the minor children. Mr. Lilley, the DCF social worker, notes in the social study which he prepared for this case:
 "Termination of Parental Rights would be in the best interests of [the children] because it would free the children for adoption or long term foster care with paternal aunt . . . in whose care they have thrived." (Petitioner's Exhibit 2, page 6).
Mr. Lilley adds that the termination is necessary "to allow Cindy, Anibal, Joel and Stacy . . . to finally know where they will grow up." (Petitioner's Exhibit 2, page 6.)
The paternal aunt, Sonia S., testified at trial. Despite the demands of her own large family, she and her husband unselfishly made room in their home for all four children. The court accepts the assessment of both the social worker and the children's attorney that each child has done very well in this placement. All of the children are now attending school regularly, and Sonia S. and her family helped the children to deal with the grief which followed their father's death. Although the aunt does not wish to take the children way from their natural mother, she is willing to adopt them, or to continue to serve as a long-term placement resource.
The mother believes that termination of her parental rights is not an appropriate disposition. She believes that DCF has "written her off." She points to the recent improvements which she has made, and claims that with more time, she would be able to reunify with and properly care for all the children. The mother asserts that she still has a positive relationship with her children, and that they wish to live with her. However, the mother admitted that she is not yet ready to resume the role of caring for these children. The respondent does not believe that the children should be required to wait a long time before she resumes their custody. However, she is unable to predict when in the future that would be.
In deciding upon an appropriate disposition, the court must consider whether or not the recent strides which mother has made CT Page 7614 in battling the demons of her addiction justify maintaining the children in the uncertain status they have experienced since March of 1994. The court must weigh the mother's potential for future parental rehabilitation against each child's need for present permanency and stability. The court concludes, in light of the past history of this case and the nature and extent of mother's drug problems, that it would be adverse to the best interests of the children to delay permanency planning for them any further. The children, who have been in the "limbo" of foster care for two years and eight months, must be assured as quickly as possible that they will be permitted to grow up in a stable and secure home. The mother is not now able to offer such a home, and the court can not determine when, if ever, she will be able to provide one for her children in the future.
Before this court may enter judgment in this matter, it must make the following findings required by CGS § 17a-112 (d):
1. Services offered: Per the court-approved expectations, the respondent was to cooperate with substance abuse treatment made available to her through the criminal justice system. She received in-patient treatment at Blue Hills Clinic and has been continuously enrolled in the Hartford Dispensary's methadone maintenance program from May 1995 until the present. The later program offered mother family counseling, recovery education groups, and 12-step programs such as Narcotics Anonymous and Cocaine Anonymous. Following her discharge from her first Blue Hills admission, the mother was offered the opportunity to reside for 4-6 months in a structured, residential drug treatment facility known as Clayton House. On her own initiative, the respondent received services from Lynn Bryant at Hartford Hospital. DCF did not offer services to the respondent. The court notes, however, that the social worker made a number of attempts without success to contact mother at her last-known address in Hartford. Evelyn R. did not contact DCF in response to the worker's visits, cards and letters, and never requested assistance or services from the agency.
2. Reasonable efforts to reunite: The court-approved expectations urged mother to visit the children as often as permitted. The mother was given unlimited access to her children, but, until recently, visited them only sporadically. As the expectations reveal, the key to reunification in this case would have been successful treatment by respondent for her heroin and cocaine addictions. Appropriate treatment modalities, such as the CT Page 7615 Hartford Dispensary and Blue Hills Clinic programs, were available to and utilized by the mother.
3. Court orders: No court orders were issued in this case. On the date of commitment, the mother signed court-approved expectations which were created to chart a course for her reunification with the four children. (Petitioner's Exhibit 1). These expectations have been discussed at length within this memorandum, and mother admitted during her testimony at trial that she knew and understood their content.
4. Feelings and emotional ties with parents and caretakers:
All four children now reside with Sonia S., and her husband Victor. Sonia is the sister of the children's late father, and is the children's aunt. The children have a close relationship with their aunt and uncle. Sonia S. testified that she and her husband are willing to adopt all four children, or otherwise act as their long-term caretakers. The children know and love their mother, who recently has visited them weekly and calls them every other day. Testimony at trial indicated that the children wish to be reunited with the mother and live with her in an apartment.
5. Ages of the children: Cindy is 14 years old, Anibal Jr. is 11, Joel is 9, and Stacy is 6. The children have resided away from their mother in relative foster care since March, 1994, and have been committed to DCF since May 26, 1994.
6. Personal efforts to rehabilitate and reunify: The respondent has attempted to overcome her addiction and improve her situation through programs and services offered by the Hartford Dispensary, Blue Hills Clinic, Hartford Hospital, and the Hispanic Health Council. Unfortunately, her efforts to achieve rehabilitation and reunification have been largely unsuccessful, and it would not be in the best interests of the children to delay permanency planning in order to allow the respondent further attempts at reunification.
7. Impediments to maintaining meaningful relationship:
No evidence introduced at trial revealed that there were acts or omissions by any person or agency which prevented the mother from maintaining a meaningful relationship with her four children. Despite unlimited access to her children, she visited them only infrequently prior to the commencement of this trial. She had access to drug treatment and other supportive services, and knew what was expected of her in order to regain her children's care CT Page 7616 and custody. DCF made a number of attempts to contact the mother during the past two years, but the mother revealed no interest in contact with, or assistance from, that agency.
JUDGMENT
Having considered the seven factors enumerated above, and having previously found as proven the two grounds alleged for termination of the respondent's parental rights, it is further found by clear and convincing evidence that it is in the best interests of each child that Evelyn R.'s parental rights be terminated so that these children may be freed for adoption. The chronic nature of mother's addiction, her lack of substantial progress in drug treatment, her history of relapses, and the lack of interest which she displayed towards the children until the eve of trial indicate to the court that termination is necessary. The length of time that the children have already been in foster care, their need for a stable and permanent home arrangement, and the degree to which they have thrived in the care of their aunt, are further indicators that this course of action is essential to their well-being.
Accordingly, it is hereby ORDERED that the parental rights of Evelyn R. with respect to Cindy T., Anibal T. Jr., Joel T. and Stacy T. be and hereby are terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed statutory parent for the purpose of securing an adoptive home or other permanent placement for said children. It is also ordered that the Commissioner shall file with the court, no later than 90 days following the date of this judgment, a written report on the progress towards such permanent placements. If adoption has not been finalized by December 23, 1997, then said Commissioner shall file a Motion for Review of Plan for Terminated Child for each of these four children which shall be heard by the court no later than March 23, 1998.
Entered at Middletown, Connecticut this 28rd day of October, 1996.
BY THE COURT
DYER, J. CT Page 7617